```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ALEXIS PADILLA,                                             :
                                                            :    07 Civ. 5957 (DAB) (DF)
                        Petitioner,                         :
                                                            :    REPORT AND
        -against-                                           :    RECOMMENDATION
                                                            :
DALE ARTUZ, Superintendent of Clinton                       :
Correctional Facility, et al.,                              :
                                                            :
                        Respondent.                         :
------------------------------------------------------------X
```

**TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

Petitioner Alexis Padilla ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, following his state conviction, upon a jury verdict, of two counts of Assault in the First Degree, in violation of N.Y. Penal Law § 120.10(1), arising out of two unrelated stabbing incidents on May 14 and 17, 2003. (Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State Custody, dated May 24, 2007 ("Pet.") (Dkt. 1).) At the time Petitioner filed his Petition, he was incarcerated at Auburn Correctional Facility in Auburn, New York.[1] (Memorandum of Law in Support of Petition Brought under 28 U.S.C. § 2254, dated Dec. 20, 2008 (Dkt. 26) ("Pet. Mem.") at 1.)

Petitioner claims that the trial court violated his right to a fair trial by precluding Petitioner's attorney from cross-examining the sole testifying eyewitness to the May 14, 2003 stabbing with respect to the facts underlying the witness's sealed arrest record. Respondent Dale

---

[1] According to the New York State Department of Correctional Services, Petitioner is currently incarcerated at Southport Correctional Facility in Pine City, New York. (*See* New York State Department Of Correctional Services, Inmate Population Information Search, http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (Search Last Name "Padilla"; First Name "Alexis"; DIN "04A4094").)

Artus ("Respondent"), the Superintendent of Clinton Correctional Facility, argues that Petitioner's claim should be dismissed as without merit. (Memorandum of Law in Opposition to the Petitioner for a Writ of Habeas Corpus, dated Dec. 10, 2007 (Dkt. 9) ("Resp. Mem.") at 13-19.) For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## FACTUAL BACKGROUND

As the result of a single jury trial, Petitioner was convicted with respect to two unrelated stabbings: the stabbing of Elias Morales ("Morales") on May 14, 2003 and the stabbing of Hansel Palm ("Palm") on May 17, 2003. In his Petition, Petitioner raises only one claim, which challenges the limitation by the trial court of the cross-examination of the prosecution's only testifying eyewitness to the stabbing of Morales. The facts of the Morales stabbing, based on the evidence presented by the prosecution at trial, are as follows:

On May 14, 2003 at about 2:30 p.m., Eli Ellis ("Ellis"), a teenager who lived in the Bronx, left his aunt's apartment at 145th Street and Amsterdam Avenue, in Manhattan. (Transcript of Jury Trial held May 25-27, 2004 (Dkt. 12) ("Tr."), at 82.) He planned to buy groceries for his grandmother at a store opposite his grandmother's apartment at 476 West 141st Street, between Amsterdam Avenue and Convent Avenue. (*Id.* at 37-38, 82-84.) Ellis was familiar with the neighborhood near West 141st Street because he had frequently visited his grandmother there, and had many friends in the area. (*Id.* at 72-73.) As Ellis walked down Amsterdam Avenue, Petitioner approached him from behind and said something to him, but Ellis

responded, "I don't got time to play games," and continued walking to the grocery store.[2]  (*Id.* at 77, 83.)

Ellis went into the grocery store for only a short time.  (*See id.* at 84.)  After he left the store, and while crossing the street, he heard the Superintendent of 476 West 141st Street (the "Superintendent") screaming "[s]top, stop it."  (*Id.* at 77, 84-87, 102-103.)  The screams came from the alley between 476 West 141st Street and a three-story residence.  (*Id.* at 86-87.)  Ellis walked toward the front of the alley and saw Petitioner standing approximately 17 feet away, with his back to Ellis.  (*Id.* at 87-91.)  Morales, the victim, stood approximately two feet away from Petitioner, and the Superintendent stood behind Morales.[3]  (*Id.* at 88-93, 102.)

Petitioner stabbed Morales in an underhand jabbing motion at least five or six times with a metal pocket knife.  (*Id.* at 94-95.)  The Superintendent screamed "stop" again, and Petitioner stepped to the side, allowing Morales to run out of the alley.  (*Id.* at 95-96.)  Morales, who was now bleeding from his stomach, stumbled out of the alley using the side of the building to support him, and ran to a nearby Blimpie's.  (*Id.* at 95-97.)  After Morales left the alley, Petitioner closed the pocket knife and began to walk away.  (*Id.* at 97.)  When he saw Ellis, however, Petitioner reopened his knife, scaring Ellis, who ran back into the grocery store to hide.  (*Id.*)

---

[2] Ellis identified Petitioner as a man known to him as "Frank," though Petitioner's name is Alexis Padilla.  (Tr. at 74.)  Ellis testified at trial that he first met Petitioner because Petitioner's brother was dating Ellis's good friend.  (*Id.* at 73-76.)  Additionally, Ellis testified that he had seen Petitioner in and around Tata's building about 300 times in total, throughout the year before the stabbing.  (*Id.* at 76-77.)

[3] Ellis did not know the victim's name, but he testified that he recognized Morales because Morales lived in the basement of 476 West 141st Street.  (Tr. at 93-94.)

Five to 10 minutes after the stabbing, Morales was picked up in front of the Blimpie's by an ambulance and brought to Harlem Hospital. (*Id.* at 142-143.) He was treated there for three stab wounds to the left chest, measuring approximately two to three centimeters each, and a partially collapsed lung. (*Id.* at 294-300.) A tube was inserted into his chest to drain the blood, alleviating a potentially life-threatening injury. (*Id.*) Morales was held in the hospital for six days. (*Id.* at 299.)

## PROCEDURAL HISTORY

### A.   Trial

At trial, with respect to the Morales stabbing, the prosecution called Ellis, a Blimpie's employee, certain police officers, and a physician who treated Morales. Petitioner did not testify on his own behalf or call any witnesses. (*Id*. at 302.)

Ellis was the only testifying eyewitness to the stabbing of Morales.[4] On cross-examination, Ellis testified that, prior to his grandmother's death in 2003, he smoked had marijuana about twice a day. (*Id.* at 100-02.) He also admitted that marijuana made him tired, although he remained "alert and aware of everything." (*Id.* at 100-01.)

After establishing Ellis's marijuana use, Petitioner's counsel inquired as to whether Ellis had any been in any prior trouble with the law:

---

[4] Morales and the Superintendent did not cooperate in the police investigation of the Morales stabbing or testify at trial. The investigating police officers questioned Morales while he was being treated at Harlem Hospital, but he stated that he did not want to talk about the stabbing, and they were unable to locate him after his release from the hospital. (*Id*. at 130-33.) The police officers also spoke with the Superintendent when they first arrived at the scene, as well as a few times thereafter, but then were unable to locate him. (*Id.* at 42-53, 126-28, 132-33, 287.) After numerous efforts to locate Morales and the Superintendent, including searching law enforcement databases, the police officers concluded that Morales had left for the Dominican Republic and that the Superintendent had moved to Pennsylvania. (*Id.* at 47, 51-53, 128, 133-35, 137-39.)

|  |  |  |
|---|---|---|
| | Q. | Your marijuana smoking got you in trouble with the law? |
| | A. | No, it did not. |
| | Q. | So, you never got caught by the police then? |
| | A. | No. |
| | Q. | You ever get caught by the police for anything else? |
| MR. SULLIVAN: | | Objection. |
| THE COURT: | | I will a let it go, overruled, have you ever been stopped by the police? |
| THE WITNESS: | | No. |

(*Id.* at 104.)

During the next recess, the prosecution voluntarily disclosed that, although Ellis did not have any criminal record, "he [did] have an arrest history, that resulted in the case being sealed." (*Id*. at 108.) Petitioner's counsel inquired as to why the case had been sealed and as to the type of case. The trial court noted that "sealed means there has been a finding that there was no criminal liability." (*Id*.) Petitioner's counsel argued that, even though the record was sealed, he had the right to cross-examine Ellis with respect to the underlying bad act, now that counsel was aware of it. (*Id*. at 108-09) The trial court rejected this argument, explaining that "the People aren't aware of it because it's sealed by the court, so I think we won't go there at this point." (*Id*. at 109.) Petitioner's counsel then noted his objection. (*Id.*)

The jury acquitted Petitioner of two counts of Attempted Murder in the Second Degree but found Petitioner guilty of two counts of Assault in the First Degree, for the stabbings of Morales and Palm.[5]  (*Id.* at 391-92.)  On June 28, 2004, Petitioner was sentenced as a second felony offender to two consecutive prison terms of 10 years for each assault conviction, plus post-release supervision.  (*See* Sentencing Transcript, held June 28, 2004 (Dkt. 13) at 5, 9-10.)

B.      **Direct Appeal**

On direct appeal, Petitioner claimed that he was denied his due process right to a fair trial when the trial court refused to allow him to confront Ellis with the underlying facts of his sealed arrest record.  (*See* Declaration of Frederick H. Wen in Opposition to the Petition for a Writ of Habeas Corpus, dated Dec. 10, 2007 (Dkt. 10) ("Wen Decl."), Ex. A, at 12.)  On April 20, 2006, the Appellate Division affirmed Petitioner's conviction, holding:

> The court properly exercised its discretion in precluding defendant from cross-examining a witness about his sealed arrest record. Defendant was unable to establish a good faith basis for questioning the witness since the facts surrounding the arrest were not revealed and it was not even known if they involved any "bad acts" (*see People v. Francis*, 790 N.Y.S.2d 103 (2005), *lv. denied* 4 N.Y.3d 853, 797 (2005); *People v. Antonetty*, 701 N.Y.S.2d 362 (2000), *lv. denied* 94 N.Y.2d 945 (2000)).  Defendant's argument that the arrest may have resulted in a disposition of a type permitting the underlying facts to be used for impeachment, such as a youthful offender adjudication or an adjournment in contemplation of dismissal (*see People v. Gray*, 84 N.Y.2d 709, 712 (1995); *People v. Vidal*, 26 N.Y.2d 249 (1970)), is based upon speculation.  It is equally possible that the sealed record stemmed from a verdict of acquittal or a dismissal on the merits, which would have negated any good faith basis for inquiring into the underlying facts (*see People v. Plaisted*, 767 N.Y.S.2d 518 (2003), *lv. denied* 2 N.Y.3d 744 (2004)).  The court was not required to unseal the witness's arrest record in the absence of a showing by defendant that any information in the record would have demonstrated the witness's bias in favor of the prosecution or hostility to defendant (*see People v.*

---

[5] Two lesser-included assault counts were dismissed.  (*Id.* at 371-72, 391-92.)

> *Acevedo*,575 N.Y.S.2d 884 (1991), *lv. denied* 79 N.Y.2d 823 (1991)).
> The court's ruling did not impair defendant's right to confront the
> witness (*see Delaware v. Van Arsdall*, 475 U.S. 673, 678-679 (1986)).

*People v. Padilla*, 812 N.Y.S.2d 530 (1st Dep't 2006).

On May 15, 2006, Petitioner sought leave to appeal to the New York State Court of Appeals, asserting the same constitutional claim he had raised before the Appellate Division. (Wen. Decl., Ex. D ("The issue raised below was whether the trial court violated appellant's due process rights when it ruled that the sole prosecution witness to one of the incidents could not be cross examined about his prior criminal record because it was sealed.").) The Court of Appeals denied leave to appeal on July 13, 2006. (*See id.*, Ex. E.)

### C.     The Habeas Petition

Initially proceeding *pro se*, Petitioner filed a federal habeas petition on May 24, 2007.[6] *(*See Pet.) Petitioner asserted that he was entitled to habeas relief on the same ground raised on his direct appeal; specifically, Petitioner claimed that he was "denied his due process right to a fair trial when the court refused to allow the defense to confront the sole testifying eyewitness to one incident with the underlying facts of his sealed criminal record." (*Id*. at 4.) Petitioner filed an Application for Appointment of Counsel shortly thereafter. (Application for Appointment of Counsel pursuant to 18 U.S.C. § 3006A(g), dated July 16, 2007 (Dkt. 4).)

On December 10, 2007, Respondent opposed the Petition by filing a declaration and memorandum of law. (Resp. Mem.; Wen Decl.) Respondent argued that the Appellate

---

[6] Although the Court's docket reflects a filing date of May 30, 2007, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the Petition to have been filed on May 24, 2007, the date when Petitioner declared under penalty of perjury that he delivered the petition to prison authorities to be mailed to the Court, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

Division's decision upholding the trial court's limitation on the cross-examination of Ellis was neither contrary to, nor based on an unreasonable application of, clearly established federal law. (*See* Resp. Mem.)

On December 12, 2007, Petitioner wrote a letter to the Court, in Spanish, indicating that he had received papers that he did not understand, and that the person who had been helping him in the prison law library had been fired. After receiving the assistance of both the Court's *Pro Se* Office and the Court Interpreter's Office in understanding Petitioner's letter, the Court granted Petitioner's Application for Appointment of Counsel on July 16, 2007. (Dkt. 14.) On December 20, 2008, Petitioner's appointed counsel filed a memorandum of law on Petitioner's behalf in support of his habeas petition, setting forth in more detail Petitioner's argument as to why he should have been allowed to impeach the credibility of Ellis on the basis of the facts underlying Ellis's sealed arrest record. (*See* Pet. Mem.)

On October 4, 2009, Petitioner sent a letter to the Court, requesting leave to withdraw the brief filed on his behalf by his appointed counsel or, alternatively, to file a *pro se* supplemental brief. (Letter to the Court from Alexis Padilla, dated October 4, 2009 (Dkt. 27) at 1-2.) In particular, Petitioner argued that, due to the fact that his appointed counsel did not speak Spanish, counsel had failed to understand that Petitioner wished to raise an ineffective assistance of counsel claim. (*Id.*) The Court denied Petitioner's request on December 4, 2009, stating:

> Petitioner's request is premised on his view that counsel's brief is deficient because it fails to raise an ineffective assistance of counsel claim. Yet no such claim is raised in the petition, and based on the statements made in the petition, no such claim was raised in the state courts, so any such claim would, in any event, be unexhausted.

(Dkt. 27.)

8

# DISCUSSION

## I. APPLICABLE LEGAL STANDARDS

### A. Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (citations omitted) (judgment becomes "final" for purposes of section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari"). In this case, as Respondent concedes, Petitioner's claims are timely because his Petition was filed within one year of the date Petitioner's conviction became final. *See Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001).

### B. Exhaustion

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his federal claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of . . . [the] prisoners' federal rights." *Picard*, 404 U.S. at 275 (citation omitted). In this case, Petitioner's claim was raised in federal terms in both the Appellate Division and the Court of Appeals, and the claim is therefore exhausted. (*See* Wen Decl. Ex. A,

9

at 13; *id.*, Ex. D; *see also Karaj v. Gonzales*, 462 F.3d 113, 117 (2d Cir. 2006) (noting that habeas petitioner may "exhaust his federal constitutional claim before a state appellate court by . . . relying on federal constitutional cases" (citing *Daye v. Attorney Gen.*, 696 F.2d 186, 194 (2d Cir. 1982) (*en banc*)).)

### C. Standard of Review

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a

10

[Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous" rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 409).

The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the "'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. at 412); *see also Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007) ("*Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions."). Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief. *Id.* (citing *Musladin*).

## II.   PETITIONER'S CLAIM

Petitioner claims that he was denied his due process right to a fair trial when the trial court refused to allow him to confront Ellis, the sole testifying eyewitness to the May 14 incident, with the underlying facts of Ellis's prior sealed arrest, particularly in light of Ellis's testimony that he had never been stopped by the police. Yet, as a threshold matter, Ellis was permitted, by state law, to testify that he had never been arrested or stopped by a police officer,

notwithstanding his prior arrest.  Under New York law, an arrest record sealed under Section 160.50 of the New York Criminal Procedure Law[7] "shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution."  N.Y.C.P.L. §160.60.  As interpreted by New York courts,[8] an individual testifying in court may deny the existence of a prior arrest that was sealed pursuant to Section 160.50.  *See People v. Ellis*, 184 N.Y.2d 307, 308 (1992).  As Ellis was thus permitted by state law to testify that he had never been arrested, Petitioner had no basis to impeach Ellis on that point.

Moreover, Petitioner's speculation that inquiry into the facts underlying Ellis's sealed record would have brought into question Ellis's general credibility is insufficient to demonstrate that his constitutional rights were violated by the trial court's restriction.  The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This right of confrontation, which is secured for defendants in state criminal proceedings through the 14th Amendment, *Pointer v. Texas*, 380 U.S. 400, 406 (1965), "means more than being allowed to confront the witness physically," *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (citations omitted).  "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."  *Id.*  Nonetheless, certain restrictions on cross-examination

---

[7] This section provides that "upon the termination of a criminal action or proceeding against a person in favor of such person . . . the record of such action or proceeding shall be sealed," and "not made available to any person or public or private agency."  N.Y.C.P.L. §160.50(1).

[8] *See United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir.2002) ("[W]hen interpreting state statutes[,] federal courts defer to state courts' interpretation of their own statutes.") (citing *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76 (2000) (*per curiam*)).

are constitutionally permissible.  The Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (*per curiam*)) (emphasis in original).  Indeed, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"  *Michigan v. Lucas,* 500 U.S. 145, 149 (1991) (quoting *Van Arsdall*, 475 U.S. at 679).

  Under AEDPA, this Court must look to Supreme Court precedent to determine whether, at the time of its decision, the Appellate Division failed to apply or misapplied "clearly established" federal law.  28 U.S.C. § 2254(d); *Musladin*, 549 U.S. at 74.  As noted above, this Court is not free to ground a habeas decision in the holdings of the circuit courts, or even in Supreme Court dicta.  *See Musladin,* 549 U.S. at 74; *Rodriguez,* 499 F.3d at 140.  Of relevance here is that, although the Supreme Court has squarely held that a criminal defendant may not be prevented from cross-examining an adverse witness regarding potential *bias*, *see Davis,* 415 U.S. at 316 (holding that "the partiality of a witness . . . is always relevant as discrediting the witness and affecting the weight of the testimony" (citation and internal quotation marks omitted)), the Court has not clearly held that the federal Constitution prohibits any restrictions on cross-examination as to a witness's general credibility.

  In *Davis*, the Supreme Court determined that the defendant's Confrontation Clause rights were violated when the state court precluded him from cross-examining a key prosecution witness as to the witness's juvenile delinquency record and status as a probationer.  *Davis*, 415 U.S. at 312, 317-18.  At trial, the defendant sought to show that the witness had identified the

13

defendant to the police in order to deflect suspicion away from his own involvement in the crime, and that the witness had acted out of fear that his probation would be revoked. *Id.* at 311. The witness's record would have been "revealed only as necessary to probe [the witness] for bias and prejudice and not generally to call [the witness's] good character into question." *Id.* In concluding that the limitation placed on the proffered cross-examination was unconstitutional, the Supreme Court held that any interest the state had in protecting the confidentiality of a juvenile offender's record could not require "yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320.

Following *Davis*, the Supreme Court has made similar rulings in other cases. In *Van Arsdall*, in which the defendant had been charged with murder, the trial court precluded the defendant's inquiry at trial into an agreement made by the prosecution's key witness to speak with the prosecution about the crime in question in exchange for dropping an unrelated criminal charge against him. *Van Arsdall*, 475 U.S. at 679. After noting the "wide latitude" afforded to trial judges to place "reasonable limits" on cross-examination, the Supreme Court held that:

> In this case, however, the trial court prohibited *all* inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending [criminal] charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated [the defendant's Confrontation Clause rights].

*Id.* (emphasis in original). Similarly, in *Olden v. Kentucky*, 488 U.S. 227, 231 (1988), the Supreme Court specifically held that, because the trial court precluded the defendant from pursuing cross-examination aimed at showing that the alleged victim had a motive to fabricate

14

rape charges against him, the defendant's Confrontation Clause rights were violated.  *Olden*, 488 U.S. at 231.

Circuit court decisions have been somewhat inconsistent on the question of whether the Supreme Court's holdings in *Davis* and its progeny may be broad enough to justify granting habeas relief where a trial court has *not* curtailed cross-examination regarding a witness's bias or motive to lie, but rather has limited a defendant's inquiry relating to a witness's general credibility.  *Compare Quinn v. Haynes*, 234 F.3d 837, 844 (4th Cir. 2000) (rejecting petitioner's claim under ADEPA, where petitioner had been prevented from cross-examining complainant as to prior accusations, so as to attack her general credibility), and *Boggs v. Collins*, 226 F.3d 728, 737 (6th Cir. 2000) (discussing *Davis* and *Van Arsdall*, and holding that, under Supreme Court precedent, "cross-examination as to bias, motive or prejudice is constitutionally protected, but cross examination as to general credibility is not"),[9] *with Vasquez v. Jones*, 496 F.3d 564, 571-73 (6th Cir. 2007) (declining to follow the analysis in *Boggs*, and finding that the holdings of *Davis* and *Van Arsdall* applied "to both bias and credibility").

In any event, considering the facts of Petitioner's claim here, in light of the relevant Supreme Court precedent, it cannot be said that any such precedent clearly prohibited the state court ruling in question.  Petitioner offers nothing more than his own speculation as to the content of Ellis's sealed record.  The mere fact that Ellis *had* an arrest record – which, as discussed above, was appropriately deemed a "nullity" as a matter of New York law – does not establish that Ellis had actually engaged in prior bad acts.  While Petitioner suggests that Ellis's record may have been sealed as the result of a youthful offender adjudication or an adjournment

---

[9] *See also Brown v. Breslin*, No. 04 Civ. 7970 (PAC) (DF), (S.D.N.Y. Mar. 31, 2008) (same).

in contemplation of a dismissal (Pet. Mem., at 16 n.1), it is equally possible, as noted by the Appellate Division, that Ellis's record was sealed as a result of a verdict of acquittal or a dismissal on the merits, *see Padilla,* 812 N.Y.S.2d at 531.  Petitioner's counsel was afforded – and took advantage of – a substantial opportunity to cross-examine Ellis with respect to his credibility.  Indeed, Petitioner acknowledges that, at trial, his counsel highlighted inconsistencies and exaggerations in Ellis's testimony, as well as Ellis's frequent use of marijuana prior to December 2003.[10]  (Pet. Mem. at 19 n.2.)  On such a record, where the existence of any basis for impeachment was speculative at best, the trial court's prohibition on inquiry into this narrow issue was well within the "wide latitude" afforded trial judges to reasonably limit cross-examination of a prosecution witness.  *Michigan,* 500 U.S. at 149; *cf. Van Arsdall*, 475 U.S. at 679 (finding a violation of the Confrontation Clause where the trial court "cut[] off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony").

As this Court cannot conclude that the Appellate Division's rejection of Petitioner's challenge to the trial court's preclusion of cross-examination concerning Ellis's prior sealed arrest was either "contrary to" or an "unreasonable application of" clearly established federal

---

[10] For example, on direct examination, Ellis claimed that he heard the superintendent shouting "stop it" when he was crossing the street (Tr., at 77, 86), but on cross-examination, Ellis testified he was "right there" when he heard the superintendent shout. (*id*., at 102).  Ellis also initially testified that he bought marijuana from a certain neighborhood (*id*., at 103), but then recanted, stating he never really bought marijuana because "people would come to [him] with it." (*Id*.)  Additionally, although Ellis claimed that he saw Petitioner every day for a year, he testified that Petitioner's name was "Frank." (*Id*., at 75; *see also* Pet. Mem. at 19 n.2 (identifying other inconsistencies and exaggerations in Ellis's testimony brought out on cross-examination).)

16

law, I recommend that the Petition be dismissed. *See* 28 U.S.C. § 2254(d); *Musladin*, 549 U.S. at 74.

## CONCLUSION

For the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, United States Courthouse, 500 Pearl Street, Room 2510, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Batts. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
November 18, 2010

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

The Honorable Deborah A. Batts, U.S.D.J.

Alan M. Nelson, Esq
3000 Marcus Ave, Suite 1E5
Lake Success, NY 11042

Mr. Alexis Padilla
(DIN: 04A4094)
Southport Correctional Facility
P.O. Box 2000
Pine City, NY  14871-2000

Alyson J. Gill, Esq.
Frederick H. Wen, Esq.
Assistant Attorneys General
120 Broadway, 22nd floor
New York, NY  10271